but she will be listening to the arguments and participating in the resolution of the case. Case is, the first case is 19-60662, Hopkins v. Secretary of State. Mr. Stewart. May it please the court, I'm Scott Stewart, I'm the Mississippi Secretary of State. This case involves five facial claims to two parts of the Mississippi Constitution. The Eighth Amendment claim has, of course, taken center stage in the case and I'd like to get right to that issue. But before I do, I want to address briefly, perhaps in just about six sentences, four other claims in the case in case I don't get to return to them. The plaintiffs bring an equal protection claim against Mississippi's permanent disenfranchisement of felons. Excuse me, briefly to address the four other claims in the case. The plaintiffs bring an equal protection claim against Mississippi's permanent disenfranchisement of felons and they bring three claims against Mississippi's legislative process for re-enfranchising felons. The panel was right to reject all four of those claims. Supreme Court precedent squarely forecloses the plaintiff's claim that the equal protection clause bars a state from permanently disenfranchising felons and the plaintiffs lack standing to sue the secretary, the only defendant they sued in this case, over the legislative process for re-enfranchising felons. Uh, the secretary has no involvement in that legislative process so he does not cause and cannot redress the plaintiff's injury. Uh, we're quite content with the panel's ruling on those four claims. We feel differently about the panel's ruling on the Eighth Amendment claim, of course, and I'll now move to that. I'd like to cover, uh, both why Supreme Court precedent in particular Richardson v. Ramirez forecloses that claim and why the claim fails as a matter of law. Can you please move closer to the microphone or I'll speak up? Sure, I apologize, Judge Elrod. Um, with respect to Richardson v. Ramirez, um, that claim has really two key pillars to it. Uh, the first pillar is that section two of the Fourteenth Amendment does not override re-enfranchise felons. It may do so permanently. Um, and the second pillar of the case is that section one of the Fourteenth Amendment does not override section two. Um, that reasoning applies fully here, uh, because to credit plaintiff's claim would be to rule that section one of the Fourteenth Amendment overrides section two. It's only through section one of the Fourteenth Amendment that the Eighth Amendment applies to the states. So as a structural constitutional matter, which was critical and central to the court's reasoning in Richardson, the Eighth Amendment claim fails as a matter of law. Um, I, I would emphasize the, the facial nature of the challenge here. There was a similar type of a claim, uh, issue in Richardson. This question of, hey, does the equal protection clause flatly bar, uh, the disenfranchisement of felons despite the Fourteenth Amendment's other protections for the right to vote? The court said, no, um, it does not flatly bar that. And again, by a parity of reasoning, the Eighth Amendment here does not flatly bar the permanent disenfranchisement of felons. Um, the, uh, the, the plaintiffs have raised a number of responses to that. The panel, um, raised a couple of them. Um, there was a suggestion that, hey, that, that reasoning is that it would, would mean in effect that, um, one constitutional provision, um, preempts another or that, uh, this Section Two of the Fourteenth Amendment somehow immunizes, um, any felon disenfranchisement law. Um, we of course disagree with those points. You, you don't need to accept either of those points to agree with our position, which is simply, again, it rests on the facial nature of the claim, the reasoning in Richardson. We're quite comfortable, for example, with the Supreme Court's ruling in Hunter versus Underwood that, uh, certain as applied equal protection claims could have force, um, and very strong force, obviously, in, in Hunter versus Underwood itself, uh, against a Section Two type authority, but, uh, that's not what we have in this case. Mr. Watson, you've waived uninterrupted time, is that correct? That's correct, Your Honor. So, um, if your, if your argument is that Richardson forecloses, um, the issues in this case, what was the purpose of the remand in Richardson on the plaintiff's alternative, um, contentions? What, if, if, if all discussion for all seasons on challenges, um, were foreclosed, then what would be the purpose of the remand? Um, to allow certain other kinds of challenges there, there, there that, um, the remand, uh, Judge Douglas was on a, hey, how is this being administered in practice? Uh, we're comfortable that there could, with the proposition, um, that there could be sort of as applied challenges against, I, I think Hunter versus Underwood is a good example of that, that a direct square violation of the prohibition on race discrimination embodied in the Equal Protection Clause is not permitted by Section Two. Um, so I think the remand in Richardson is court, sort of, I think, of a piece with that. Um, so we're not saying that Richardson, um, necessarily on its own, you know, forecloses all other challenges. It just, it's a very strong bar to, uh, facial claims that, uh, a state cannot disenfranchise. That's the, that's, I think, the key difference. Um, moving on to, I think, um, if I may, the sort of question of it, uh, if, if, even if, even without Richardson, um, the case is very strong here that, uh, felon disenfranchisement also is not punishment. Again, even, even without disenfranchisement, permanent felon disenfranchisement does not, uh, create an Eighth Amendment problem or really an Eighth Amendment issue, um, because permanent felon disenfranchisement is not punitive and does not fall under the Eighth Amendment's restrictions, uh, at all. Um, I think it's worth sketching out, um, the right analysis or how this, this issue should be approached because we respectfully disagree with the way the panel did approach it. The panel, um, you know, a number of other cases that when you are asking whether, say, a statute imposes punishment, you look at the text and structure of the statute. That's what you look at first and foremost. You see what did the legislature intend and, you know, at step one, and if they didn't intend something punitive, you move to step two and say, hey, on the face of the statute, is this nonetheless kind of punitive in fact, um, in a way that would uh, that provision is all about qualifications to vote. Um, I think as Judge Jones pointed out in her panel stage dissent, you know, look, this provision lays out, you know, age qualifications, registration qualifications, citizenship, residency qualifications, and right there along all of those, um, proper regulations of the right to vote is a list of felonies for which someone is permanently disenfranchised on the ... Um, I, I think the original intent in, as, as first enacted, of course, we agree, Judge Graves, that, um, it was a bad, a bad intent and it was discriminatory, um, with respect to the number, the, the crimes chosen. The reason it was enacted, isn't that right? Um, I, I, not, not for a punitive intent, Your Honor. I think it was just a, it's, there's a distinct question, for example, whether, um, there's an improper motive and whether something is a constitutional punishment. Um, I, I, the plaintiffs have not pointed any evidence that Section 241, um, is a constitutional punishment. Again, on the face of, it, it is about qualifications and regulation of the electoral franchise. So, I, again, I think your, your point ... Do you agree that the, it was an invalid, even accepting that it's a voter qualification, at its origin, it was an invalid one? Um, I, I think, as to, racially impermissible, kind of under, under, versus under what analysis, you know, that provision, you know, I think this Court, this Court en banc has recognized that, yes, that would be the case if, if it were never, never touched again, Your Honor. I thought ... So, um, I, are you saying that all voter qualifications have to be either or, they're either non-penal or they're penal? Or, why wouldn't it be, even if we accept your argument that it's been plopped into the section that calls voter qualifications, nonetheless, what the State's doing is saying to somebody, because of your crime, we're throwing you out of the electorate. That sounds punitive. So, the question is, is it binary? Do qualifications all have to be either or, or can something be both a qualification, but it's a punitive one? I mean, I, I think it is, I mean, I think it is binary, Your Honor, and I think you do look ... Your answer is yes. Qualifications are always age residency. Those aren't punitive. But even here, where States are saying, because of your crime, we're throwing you out of the electorate, you're saying that's not punitive? Um, that's not punitive here, Your Honor. I, I think the reason I'm getting a little bit, um, I, I'm hoping I'm understanding the question correctly is, I think in these, you know, is something punitive or not cases, the Supreme Court really is looking at, you know, it's an either or fork in the road question. I'm not saying that just because ... I, I mean, I, I think Smith versus Doe is a good example. Mendoza-Martinez is a good example. It's just, you know, is this punitive or not? I mean, again, we're, we're asking the question, at least in the Eighth Amendment context, you know, is something punishment? You know, in other constitutional provisions, we're also asking, you know, is this punishment and is, is it therefore subject to things like the double jeopardy clause, perhaps the due process clause, um, some of those other clauses. So it, it really, you know, is getting it, you know, ultimately, is this a punishment or, or not? And, and what I'm saying is that, you know, you look, as Smith versus Doe and other cases tell us, is you look at the text and structure and hear all of those markers, um, as, as I think the Supreme Court put in Kansas versus Hendricks itself, is nothing on the face of Section 241 shows a punitive intent. It shows, again, just qualifications for electors, qualifications for the right to vote. And it's the text and structure that you look at for that. And it's at the second step where you can say, okay, you know, whatever the intent is, um, is it punitive in fact or is, is it overcome? Now, it's a, it's a steep burden there, especially on a facial challenge. I mean, the plaintiffs have to provide the clearest proof, uh, to overcome what on its face is a non-penal regulation of the franchise. And, and here, you know, moving to those factors, Your Honor, um, they just haven't done that. I mean, felon disenfranchisement, um, we've cited cases going back well over a century recognizing that, um, you know, in our country's tradition, felon disenfranchisement is not a punishment. Um, we, it does not serve the ends of punishment, deterrence, retribution, those sorts of things. Um, it is, uh, it has a non-penal aim of regulating who is fit to involve, be involved in making our laws, which is a very, very serious subject. You know, my friend, Mr. Youngwood, you know, emphasizes, hey, look, voting is really important. It's a fundamental right. And you look, voting is important, but voting is not just a right. It's a significant responsibility. I mean, it's, it's the act of trying to control other people's lives. And what the Second Amendment and what our traditions recognize in disenfranchising felons for so long is that, you know, there are certain, um, features of character and judgment that felons, people convicted of, of those kinds of offenses, show that they are potentially incapable of proper ... The category we're talking is not just people convicted. It's people who have, citizens of Mississippi who have successfully, completely fulfilled their sentences. That's right, Your Honor. Just doing the math, how many states presently, um, forbid, permanently disenfranchise a significant number of their citizens who have fulfilled their entire sentence, and states don't give first offender exceptions, nor do they limit it to violent crimes, murder, and rape? How many states are in that little Eighth Amendment orbit that we would be looking at? Your Honor, I'm, I'm not sure that I have the exact number with, with the caveats. The three, the three categories are permanently disenfranchise their own citizens, even though they fully, successfully fulfilled their sentence. Number two, the state doesn't give an exception for first offenders. And number three, they don't limit it to vote crimes, murder, and rape. Right. I mean, it's, it's, it's a, it's a smaller number as you go through all those, Your Honor. I mean, I think the permanent disenfranchisement number, it's, you know, around a third of the states. I mean, you might debate a couple of the states. Um, I, I think that, I mean, again, that's at the sort of, is this subject to the, you know, you know, is this a cruel and unusual punishment? If it isn't even a punishment, Your Honor, but again, I mean, I, I would emphasize. I'm assuming it's a punishment for the sake of argument. Sure. I'm assuming we've had a precipitous trend nationwide to restore rights. Of course, Texas and Louisiana do. Mississippi doesn't. And I'm, I'm, I've given you a hypothetical about the category I'm interested in. Yeah. Um, but, but what you, you began your argument by saying, well, the Constitution can't declare itself unconstitutional, essentially. Section one can't invalidate. That hasn't been the story in the Eighth Amendment context, right? The Fifth Amendment recognizes capital punishment three times, and yet we've got the entire line of Eighth Amendment law overturning state laws. Well, I think it's a little different there, Your Honor, because I, I don't think you have a, a, uh, kind of a, a square, like you can execute, you know, any offender for whatever the offense is kind of a prohibition, even as the Constitution recognizes capital punishment. We do in section two have a square recognition. States, states can disenfranchise. It doesn't impose any temporal limits on, on that, Your Honor. So I think the Eighth Amendment kind of runs into a much kind of clearer, firmer bar in section two. I would also say just on kind of a category issue, Judge Higginson, um, two points. I mean, Section two, let me understand. Your argument is section two is a stronger bar constitutionally than the text of the Fifth Amendment? Well, I, I, I think it's, the overriding of a square, square constitutional text would be clearer here because the court would be saying like, okay, even though section two allow, recognizes states can disenfranchise, imposes no temporal limits on that power, we are saying the Eighth Amendment overrides that square allowance. At, at the least in the capital punishment context, Your Honor, I mean, yes, the Supreme Court has ruled out, uh, capital punishment for certain categories of offenders, but it hasn't ruled the death penalty wholly unconstitutional or unconstitutional. I think it's fair to say in a, a sweeping majority of its applications or anything like that. Um, I, uh, I, sure. You know, if I, if I can, you know, mention two other things on, on sort of the cruel and unusual piece and then I, I'd like to, you know, kind of hope, hope I drive home a couple points more on, on why we're not talking about a constitutional punishment here. Um, one is that around 48 states or so do disenfranchise felons. You know, yes, they end up drawing the lines a little differently, but I think this gets to why a categorical Eighth Amendment type analysis really just does not fit here. Um, when you're talking about where to draw the line, I mean, that's much more of a legislative task. When you're talking about sort of the Supreme Court's line of cases about whether something is categorically unconstitutional or not, we're talking about very clean categories. You know, death is different and juveniles are different, are the short versions of both of those. You can see those categories, agree with them or not. They are clear here. It's sort of where do you draw the line? And states can draw it and have through the history of our country drawn different lines. Um, if I can emphasize just a couple. Also, it seems to me that the line though, that principally the plaintiffs are saying is that it's permanent versus temporary. And that's a very clean line. Uh, certainly the state may push back and say certain, certain crimes, certain convictions perhaps could be permanent. Others might not be, but if you get into that, but, but a straight up, uh, if it's permanent, uh, that's a punishment. That's the line. What's wrong with that? Insofar as fitting within your analysis. Sure, Your Honor. I mean, I, I think, you know, I think we still do have something of the line drawing problem, but I think Judge Southwick, I think it points back to a little bit about why this is not a punishment at all. I mean, again, when states are disenfranchising, at least when Mississippi is disenfranchising, it's about a qualitative judgment. I mean, it goes back, you know, a long time that, you know, the Supreme Court said this in the Hawker case. It said it more recently in the Smith versus Doe case that, you know, look, when regulating important matters of public welfare, states can make universal rules. They don't have to make individualized determinations. You know, sure. Some, some folks could reform, become very responsible, good citizens, um, could, could potentially become, um, good voters, but the Court can, or the, the, the people of Mississippi can say, hey, look, you know, we think as a category that this is an unlikely group who's going to be fit to exercise the franchise. We think that, um, permanently barring from it or presumptively permanently barring from that is appropriate, and I . . . That may have a little more currency if all felons were disenfranchised, but they're not. It's a selected list under Section 241. So, doesn't that undermine your argument that, well, felons permanently can't be trusted to exercise the franchise? Well, I think, I think, Judge Wilson, you, you look at the nature of the judgment there, and, you know, states have over time . . . I mean, some states, um, kind of draw the circle kind of bigger. Other states draw it a bit more narrowly. I mean, some are . . . think election offenses are particularly bad. I mean, some might say, hey, you know, why just election offenses? Why not murder or some of those more horrible offenses? And I, I don't think it's a strike against Mississippi that, you know, we've kind of confined it to a set of, uh, crimes that, um, that people think are just especially problematic or worrisome, um, from a severity of conduct, a judgment, a law abiding, a law making type standpoint. Um, so even though we, we could go broader, I, I think it is reasonable here. I, I don't think . . . I think it's notable in this case that, um, you know, unlike, you know, Harness, there's not, there's, there's not really much of a challenge in the way of, you know, hey, these are the crimes you've selected. What's, what's wrong with them? Um . . . I guess the question is what, at what point does the state's policy judgment become so random that offends the Constitution? Um, again, I mean, there's . . . if, if it's sort of random and arbitrary, Your Honor, I mean, I think that's, I, I mean, I think a different kind of a claim. What I, what I'd say here, though, is that, I mean, it's, it's not a random set of crimes. I mean, a number of these are, um, well-established, serious common law crimes. What's, what's the nexus between the crime and the determination that someone ought to be permanently denied the right to vote? For example, stealing timber. What's the connection between that and voting? Sure, Your Honor. So, I, I want to answer that, that directly, but, you know, can I first emphasize just one point in response to the timber, uh, theft? It, it's that, again, I think it's important to recognize this is a facial claim. So, the, the plaintiffs do like to emphasize timber larceny, but, again, I mean, we're, they've gone, gone after everyone, all of its applications, just gone after the entire, entire thing, so they, they only really get so much from the timber larcenist. But to, to get right to your question, Judge Graves, um, it's very fair to say that the people of Mississippi don't want to be governed by a thief. I mean, even if it's, you know, a small amount of money, I mean, dishonest in small things, dishonest in large is, is a reasonable determination. Again, I mean, the state broadly, um, it, it didn't. It's taken a different approach than some other states have taken, but I, I think that's the intuition. I mean, Judge Friendly recognized it, recognized it. This court in Shepard v. Trevino, uh, many decades ago recognized it, that, um, you know, somebody who's shown antipathy to the state's laws, especially with felonies, somebody who's broken the state's laws, should not be, or a state could certainly reasonably think should not be involved in, in making those laws. And, and that's the qualitative to make as a, a permanent matter. Again, other states may do it a little bit differently, but it's certainly reasonable for Mississippi to have done it, um, that way. A facial challenge means that all the felons who were convicted of, uh, murdery, murder and rape would also be re-enfranchised, right? Allegedly, if they finished their sentences. Right. I mean, yes, Judge Jones, and that is the upshot of the plaintiff's argument. Um, they, I, And, and as far as theft goes, wasn't, wasn't it Bernie Ebbers, who was the head of World Com in Mississippi? If he had been convicted in Mississippi, he'd be re-enfranchised. He stole millions and millions of dollars in what appeared to be a Ponzi scheme. He'd be re-enfranchised. Right. I mean, I think, I, I, I, I, I confess, I don't know the particulars of those facts, but again, I mean, theft, I, I think it, it does point that you do get a, a, a number of ranges of, of, of theft, Your Honor. And again, we're talking about honesty and good judgment and again, the act of voting, which again, we recognize is very important. Has burglary been removed from the statute? Am I correct about that? It has, Your Honor. So how do you draw the line between theft and burglary? Since we're talking about moral character. Right, Your Honor. I mean, I think, you know, it's, two, two thoughts on that, Your Honor. I mean, one is, it is kind of a legislative judgment about, about, about things there. I think burglary, unfortunately, it, it had a taint in the state constitution at the time. So, you know, there would have been other reasons for the state to remove it just given its kind of 1890 provenance. But I think the state and people made a different decision with respect to the other crimes. I mean, again, you know, states could draw the lines differently, but Mississippi has focused on these crimes. If I can just mention one other point, you know, we've talked about the importance of Mendoza-Martinez factors. My friend emphasizes, you know, voting is really important. And, you know, we recognize that, but a big response to that is when you're dealing with something, whether something's a punishment, I mean, these things are very, like, very often important, especially when they reach the Supreme Court. I mean, physical liberty, you don't get much more fundamental than physical liberty. And the Supreme Court has in multiple cases held that significant restrictions on physical liberty are not punitive. I mean, even indefinite civil commitment. That was Kansas versus Hendricks. Um, pretrial, um, non-bail, uh, pretrial detention in United States versus Salerno, that's for somebody who is presumptively constitutionally innocent. Those are very, very severe restrictions. Again, the restriction or taking away of the right to vote simply is not comparable. If I can just briefly mention before, before I, I sit back down, um, the Readmission Act. That's come up, and I'd like to just briefly say, um, with respect, the panel got the analysis on the Readmission Act wrong. Um, it should not have begun with the Readmission Act at all. It should have, again, first of all, looked at Section 241's text and structure. Um, to the extent it got to the Readmission Act, it needed to look at the broader context of the time. And I think the mistake the panel made was to look at one word, punishment, in one statute, dealing with a different question, and ruled that that kind of decided and dictated a significant constitutional question for all time. Um, again, I mean, as we've said in our briefing, that doesn't account for the reality that punishment can mean multiple things. I mean, again, the Second Circuit, the Eleventh Circuit have repeatedly used punishment to mean different things in the disenfranchisement context. But when pushes come to shove, both of those courts have held that felon disenfranchisement or criminal disenfranchisement is not punitive. And if I can just add kind of another point about the reading of the Readmission Act, you know, customarily, when a court is reviewing, um, you know, just reviewing statutes, in addition to looking at text and structure, when they look kind of to broader context, the court should be applying certain canons, like avoiding preemption, avoiding, um, constitutional invalidation, avoiding major questions. The panel's decision in this case, um, with respect ran afoul of all three of those points. I mean, again, the panel found preemption. The panel found that the Readmission Act preempts, would preempt Mississippi law, and it found preemption in order to reach a constitutional issue, a major constitutional issue, to invalidate Mississippi's permanent disenfranchisement of felons, and to do so in what is really the most implausible way. I mean, the panel held that the Readmission Act dictated that, uh, permanent, that disenfranchisement in Mississippi is an Eighth Amendment punishment. It did that in 1870. The Cruel and Unusual Punishments Clause was not incorporated against the state for more than 80 years. The idea that the, uh, Readmission Act was dictating that reenfranchisement or disenfranchisement was a punishment, um, for all purposes, for all times under the Eighth Amendment, is simply not plausible, and it's not realistic to think that, uh, that major question was answered at that time. Thank you, Your Honor. Uh, good morning, Your Honors. Uh, Jonathan Youngwood for the plaintiffs, and may it please the Court. Um, I've also waived, um, any uninterrupted time, um, but I do want to begin with this. Um, I'm going to focus on, on the Eighth Amendment. We don't waive any of the other arguments. I'm happy to address them if the panel has questions, but the panel's decision in this case turned on the intersection of two bedrocks of our society, the right to vote, the fundamental right to vote, and the right to be protected against cruel and unusual punishment. It's important to recognize, however, what this case is not about. It is not about whether or not permanent disenfranchisement for certain crimes is barred by the Eighth Amendment. Our class is defined only to include individuals who have completed their sentence. Our positions and arguments, this case, does not rule out the possibility that some crimes, crimes that the Mississippi legislature has, um, identified as ones deserving and then enforcing lifetime imprisonment, and those include most of the most heinous crimes that have been raised. Those are not what this case is about. Those cases might well, those individual circumstances, might well result in a citizen never voting again. But what is unconstitutional in 2024 is imposing punishment, the punishment of undemocratic punishment for the rest of an individual's life. I want to start with Richardson. I'll spell that out a little more. So, so, the dif, I agree the murder and rape, the likely sentence is going to be very long and disenfranchised on that argument, but what about election crimes? Those sentences are going to be short. Those defendants will have fulfilled them. Is your position, given that it's a facial attack, that we would have to say no state, because of the Eighth Amendment, can permanently disenfranchise someone who's been convicted of an election crime and fulfill the sentence? Is that, is that where we would have to go? I, Your Honor, I think a different law that only identified a re, election crime, and there are some few states that single out those, I think it's four or five, according to the panel's analysis, that might be a different circumstance. The problem with 241, which is multiple, but includes what some of the questions went to, is its complete randomness of which crimes it identifies and how it ties them to this lifelong consequence. And to give just a few examples, you know, crimes that are excluded today from 241 include theft under Mississippi Code 974519, false acquisition of a prescription, welfare fraud, assault, aggregated assault, and simple assault on a police officer is excluded. Instead, what you have is largely crimes that were identified well more than a hundred years ago, which I think both plaintiffs and the state agree what the purpose was behind that statute and the problems with that statute as it was enacted at the time. And they have nothing to do with a legitimate reason to disqualify somebody from voting. It goes a bit to the argument as to where this shows up in the Mississippi Constitution of the 1890s. So counsel argues that because it talks about things like age and residency and other things, and then the next thing is did you commit one of the disenfranchising felonies, you're disqualified. And although not an argument, but in the brief, there's a comparison to the Eleventh Circuit's analysis of an Alabama statute on that. Mr. Youngwood, did I misinterpret the briefs or has felon disenfranchisement been part of Mississippi's law since the 1830s? The 1890s amendment to the Constitution replaced prior laws. You are correct, Your Honor. And is it not also the case that as of the time of the framing of the Constitution, eleven states disenfranchised felons? I'm sorry, Your Honor. Which Constitution, Your Honor? I'm reading from Judge Friendly's opinion in the Greene case, talking about the history of the Bill of Rights, that the framers would not have considered disenfranchisement to be unconstitutional. And he points out that eleven states adopted disenfranchisement between 1776 and 1821. Twenty-nine states had such provisions at the time of the Fourteenth Amendment. Your Honor, I have no reason to dispute Judge Friendly's statistics. Another statistic he had was that as of the time of the Greene decision in 1967, or maybe as of 1964 when the underlying acts took place, I'm not sure, there were 42 states at that time that did disenfranchise. That's true, but he also wrote before Richardson, he wrote before Romer v. Evans, where the court in 1996 described a principle that states may disenfranchise a convicted felon as, quote, unexceptionable. And in Crawford v. Marion County, where that was Justice Stevens, of course, said identified felon disenfranchisement as a neutral and nondiscriminatory reason. Your Honor, the two Supreme Court cases you mentioned were not Eighth Amendment cases. This case is not. The Eighth Amendment challenge is not in. Well, we take Supreme Court dicta even if you consider this dicta, which probably is not very seriously. And, of course, there's Trapp v. Dulles itself, which started us on this path of judicial reimagining of the penal code. Your Honor, if I could go to perhaps several of your questions. I do not dispute that felon disenfranchisement was common in the 1800s, in the 1700s, even in the 1900s, and certainly at the time of the Green decision. But because something was common 50 years ago, 100 years ago, 200 years ago, does not mean that it's not subject to Eighth Amendment analysis if it's punishment and if it's cruel, unusual, and if there's been a change, a substantial change, which I think is undeniable here, undeniable here in the national consensus on this issue. Well, what is this issue? I mean, we're not looking at whether states can disenfranchise felons. We're really looking at, per Judge Southwick's question earlier, temporary versus permanent or is it a randomness? What exactly is the issue where there's been this change and how are we supposed to look at that? Thank you, Your Honor. I agree there's different ways to slice the data. Any way you slice it, the significant, significant minority, and to answer the question on how many disenfranchised permanently for rape or murder, we tried to count. It's about seven. It's a subset of the ones that the panel identified as of 2020, and then there are a few for election fraud, but you're at best at 20 percent of the states, which is obviously a very significant drop from 42. Counselor? Yes. I'm sorry. You can finish your answer. Go ahead. Your Honor, I'm giving you statistics that are largely in the paper. So in 1974, in the Richardson case, the argument was made, quote, that disenfranchisement is outmoded and the more modern view is that it is essential to the process of rehabilitating the ex-felon that he be returned to his role in society as a fully participating citizen. Now, the Supreme Court acknowledged that that was a very powerful argument for the California legislature. It said, it is not for us to choose one set of values over the other. In other words, if we were sitting in a committee in the Mississippi legislature listening to this argument about temporary versus permanent versus murder versus timber theft, your arguments may have a lot of purchase, but we are a court of law, and didn't the Supreme Court exclude exactly these kinds of considerations from the decision making of a judge? So several answers to that, your Honor. First of all, if courts could not overrule legislatures based on facial challenges under the Eighth Amendment, there would be no facial challenges legitimate at all under the Eighth Amendment. What I would submit is the question, which I admit is a novel question, a novel question for this court, is whether or not voting rights, fundamental voting rights, are something that are punishment in the context of Mississippi, which I think is quite special because of the readmission act and because of the fact that it focuses only on Mississippi's crimes, which I'll try to get to in a second, whether it's punishment and whether it's worthy of the same type of facial challenge that the Supreme Court has allowed in, I agree, other contexts such as death. Well, let me ask you to draw out this Eighth Amendment for a minute because last year there were something like 13 executions in the United States. The year before that, there were maybe somewhere between 13 and 20, and an article trumpeted the fact that the death penalty is on a clear path to extinction. So why not go after the real culprit here, which is the real Eighth Amendment thing that the Supreme Court has said clearly is subject to evolving standards, and go after the death penalty? How is there any difference between your argument and the follow-on that the death penalty must now be unconstitutional? Your Honor, we're clearly not making any arguments about the death penalty. I understand that, but logically speaking, where is there any difference between your evolving standards, pick and choose, and the constitutionality of the death penalty? Your Honor, I am not a death penalty expert, but I understand there are a multitude of reasons why executions might have declined. I think many of them relate to complications. I was reading in the paper this morning complications of finding a method of execution that a manufacturer will provide the chemicals and other things. I think there are a lot of reasons, and we're not making that argument. But until the law is that there are no facial challenges under the Eighth Amendment, the question will be what categories are worthy of challenge. And yes, Your Honor, if somehow 40 of the 50 States were moved towards no death penalty, somebody might come before you and make that argument. I can't say they wouldn't. Suppose the Mississippi legislature, over here, suppose the Mississippi legislature tomorrow adopted a new disenfranchisement rule, all felonies. What's your position on that? My position would be perhaps weaker, but the same, Your Honor. At least it would not contain all the elements of this being completely, honestly random. Doesn't that conflict with Richardson? Because I thought the whole point of Richardson was that the Section 2 framework of the Fourteenth Amendment essentially gets rid of Section 1. This is literally a Section 2 hypothetical that I'm giving you, right? All crime. No, Your Honor, I think it's quite clear that Section 2 doesn't get rid of Section 1. Your own concurrence and harness acknowledge that there are other parts of the Constitution that might apply, as the question before Richardson itself. Right, but that's why I'm asking you this question, right? My concurrence made clear if you enforce a disenfranchisement in a particular way, a racist way, a way that only Democrats and only Republicans, a First Amendment violation, of course there could be execution problems. I'm giving you the hypothetical that nails us down. All felonies are now subject to disenfranchisement Why is that not exactly what Richardson was talking about? Well, it may have been what Richardson was talking about, but it was talking about it more than 50 years ago without facing an Eighth Amendment challenge. Again, we reserve our other arguments on Richardson, but I'm— This is not technically an Eighth Amendment case, right? This is a Fourteenth Amendment Section 1 case, or do you disagree with that? I'm in federal court. The way I get to the Eighth Amendment is through Section 1 of the Fourteenth Amendment, absolutely, Your Honor. Counsel, let me follow up on Judge Jones' question. Assuming that Louisiana, let's say, is the only state out of the 50 that imposes the death penalty for—pick your crime—but it's the only state that imposes a death penalty for that offense, would you say that makes it unusual? It certainly makes it unusual. Okay, so we're left with the cruelty factor, cruel and unusual. How do we gauge the concept of cruelty, whether it's depriving someone of their right to vote or their liberty? Who sets that bar? Do we look at the time of the law that was passed or the Constitution, or is that something that the legislature decides in modern times, or is that something we look elsewhere for? Your Honor, I think in terms of defining Eighth Amendment, you would want to look at today. So a law that was passed a long time ago, again, practices that were a long time ago that society thought were acceptable and not cruel and then not unusual, because they somewhat go together. Concepts of cruel can go with unusual. That law could become unacceptable. And so I think the focus is on today. I think a factor a court would look at in the circumstance you just raised is the other 49 states, the District of Columbia, whatever jurisdictions they look at. That would be very relevant. We think it's relevant here. Logically, would we look at other countries, at what Europeans do or whether people get caned for crimes in Indonesia? How far do we go with evaluating this current standard of cruelty? Your Honor, I think it probably depends on context. I'm not here arguing the laws of any other countries. I'm arguing the laws of the many states of this country. Well, I'm just asking, where do we set the bar for this? I understand you're trying to find some type of limiting principle or some type of guidance that gives us something to go to right away and make this determination. I think it depends on the context of what's being challenged. And so I think for voting, for voting in our American way, and obviously other countries vote, but we've been doing it for a very long time, and it's the center of what we are. I posit. The Supreme Court cases say it. I think it's an easy thing for my friend and I probably to agree on. Voting is very much the center of what we are. I think what other states do is quite relevant in this context, perhaps more relevant than in any other context, arguably. It's the fabric of American society. I'm curious the consequences of your cruel and unusual punishment theory on other aspects of felon rights. As you may know, there's a, this was mentioned in one of our opinions in a case called U.S. v. Seekins, a growing trend of criminal justice reformers being concerned about felon disarmament. A lot of prosecutors are saying that that's not fair to go after felons purely for gun possession. I take it at some point then, would your logic of your theory allow public defenders to argue that felon 922 type offenses might be cruel and unusual? Yeah, again, Your Honor, not my case, but my reactions are that's different, that it's different. But you see why I'm asking. It's, I'm taking the logic of your cruel and unusual theory and applying it to other types of rights, such as felon disarmament. And I think the question's been raised perhaps by Judge Jones at the first argument on, um, on other recreational activities or on sitting on a jury. And I get that there are lots of other rights. And this one's an express enumerated right that I'm talking about, the Second Amendment. Yeah, but felons can't be lawyers in most places. Isn't that an infringement on their fundamental rights? So there are cases, um, on lawyers. There are cases on physicians. I think that is, your, uh, Judge Jones, a property right. It's a different type of, it's a licensing right and it is different than voting. And I will say that if I cannot convince you that voting is in some way different than a lot of the things we're talking about, then I will not convince some of you. Well, that's what I, that's why I mentioned the Second Amendment. I'm happy to... It's an express constitutional right. I assume we... I think... The Second Amendment, at least as much as the right to vote, how, how would that analysis apply to, uh, 922G? Well, I, I don't, I, recognizing that there is a, the Second Amendment does guarantee certain rights to bear arms with certain restrictions. It's not, in my view, as broad as the obvious right to vote without restrictions, right? The Second Amendment is a much more complicated, um, amendment in certain circumstances. Um, I would say the statute... Right, if you have a felon who also involves some of these other circumstances, fine, we can have that conversation. I... But, but again, if, if it's cruel and unusual to deprive a felon of one right, I'm assuming we would apply that to other rights. Why, why favor voting over other express enumerated constitutional rights? I, I think it, to answer your question, Your Honor, it might apply to other rights. It does not seem to be as strong an argument, in my view, as the one I'm trying to make today. Well, why is that though? Because I guess what I'm wondering is if we rule in your favor, hypothetically, uh, why wouldn't the next move be federal public defenders across our  Well, I just think that would be a natural... Because... I would do it if I were an FBI agent. Because they have to go through each of the hurdles that, that I must go through here. Oh, sure. Is it, is it punishment? But there is, but there is a trend... Is it, is it punishment? ...of people talking about fel, felon disarmament being, being a bad policy. I, again, I don't have the statistics, Your Honor, but I don't know that, that, you know, no more than depending on how you count, you know, one out of five states, and frankly, I think there's a way here to count that it's really only Mississippi and Virginia that have the laws exactly as, as, as extreme, and by that I mean in only those two states by our count is every disenfranchised crime, every one in the permanent list, forever, till you die. And those, so I, I can actually tell you to answer the question, how do we count? I can count that we're one out of, that, that the state of Mississippi is one out of 25, and in fact, markedly is different than Louisiana and Texas, the other two states that make up the circuit, which, you know, some number of years ago changed their laws toward the national consensus. Counselor, you're talking about how to do the numbers. It, it seems to me that your argument really is a categorical argument, in part by what Judge Duncan quoted from Richardson and which you know fully well, that what is a legislative judgment? It seems to me if you're looking at individual crimes, even if they're, they seem like a random list, that is still a legislative judgment. It seems to me your principal argument that would withstand that is really looking at the category of permanent versus temporary, and I'm, I mean, whatever merit either one of you has in your arguments, it does seem to me there's less merit in your argument that there's a problem with the list than there is merit potentially in your argument that there should be no list for permanent disfranchisement. And, and so if, if, Your Honor, that is a clear category, it's a bright line, and it's one that if we go to the numbers, the trend is overwhelming from 42 in the 60s to 32 in 1974 to 21 in 2000 to 15 in 2020 and arguably a few fewer today. And so there is a huge trend, a huge national consensus. I do think the fact that the way Mississippi does it is notable, and I think the fact that most of those states that are in that 15 actually don't do it for, well, most, meaning all but two, don't do it for their, all of their disenfranchising crimes feeds into both the unusualness and actually the punishment aspect of it. Because I think while this is not a, we are not bringing a racial case, this is not Harness, at least not the 241 challenge, the 253 where you get to it does have a racial aspect. It feeds into the punishment thing. And what I wanted to get to, because it is a comparison with the Thompson case in the 11th Circuit looking at Alabama, and it goes to counsel's argument that look where this is, it's in the categories. There's a huge difference between the Alabama statute, which also says you have to have lived there a certain amount of time and age, and Mississippi, which has those same types of provisions. And the difference is, and this is very much in the briefs in the Alabama case, in Alabama, you are disenfranchised if you committed these crimes anywhere. So if you committed them in Mississippi and moved to Alabama, you would be disenfranchised. The converse is not true. If you're in Alabama and committed a crime and moved to Mississippi, Mississippi doesn't speak to you on this subject. And the distinction that the counsel made in that case, and the court makes specifically, is that it couldn't be penal in Alabama, because Alabama has no ability to punish somebody from Mississippi for committing a crime. In Mississippi, and this goes to all the subjective factors as to why this is punishment, even if you get past the Readmission Act, which I don't think you can, but if you do, it shows that in passing this, they were tying it directly to scienter-based crimes that somebody was convicted of. And in addition to years of time in prison or parole or whatever it would be, there was also the punishment of taking away the franchise of voting for life. Mr. Youngblood, back to the distinction between permanent and temporary disenfranchisement, is it your argument that to permanently disenfranchise any felon who has completed his or her sentence violates the Eighth Amendment? This is similar to a question. I think there could be a different statute with a different history. Okay. So if a state says, if you're a rapist, you served your 40 years, you served your time, but you're still permanently disenfranchised, because we don't think somebody who committed Your Honor, it's possible if that was as narrow as the statute was, or it was very closely defined only to rape, murder, and there was a reason that it had something to do with the franchise. Maybe the answer is so horribly heinous, were you tied in a voter crime? I think it would be an extraordinarily different case than the one that's presented. Okay. Armed robbery. I served my 35 years armed robbery. I served my time, but we still don't want people who committed armed robbery to be voting. Does that violate the Eighth Amendment? I think the broader you get, the closer it gets to this case. And also, many of those may not have been passed as punishment. This one, the history is quite clear. Stealing a car. You served your 25 years, you did your time, but we still don't want people who stole cars to be voting for mayor. Is that cruel and unusual punishment? I'd have to look at what the other states did, what the reason was. My point is probably clear at this point, that these are legislative judgments. There is no judicial calculus available to tell the difference between a rapist and an armed robber, or a car thief, or a timber thief, for that matter. Well, Your Honor, again, the example is obviously an easy one for us, but the timber larceny one, it makes no sense whatsoever. Why not? What if someone stole my timber? Why should I want that person voting? It's my timber. It's a theft. It depends, Your Honor, if you attached it for purposes of punishment, and in that example it's very hard for me to see why you would do it other than for punishment. Again, not our case, but it would be very hard. Here we have a clear history, a clear history of what the Mississippi Constitutional Convention did when they first put this, and what follows, but focusing just on that, just on that, in a world where you had the Readmission Act, the Readmission Act, which is prominently featured in Justice Rehnquist's majority opinion in Richardson. Well, it's featured, excuse me, if you read it carefully, it's featured in order to show that everybody in the Reconstruction Congress thought the disenfranchising felons was okay. And that leads me to two questions I had. What do you do about the fact that no other circuit court has adopted the argument that disenfranchisement is unconstitutional, and are you relying on the Readmission Act? So, we are relying on the Readmission Act and other things, and we are relying on the Readmission Act for two possible arguments, two arguments. One, it was a condition of reentry into the Union, clear as day, and in fact, although not quoted in the briefs, but quoted in Richardson, and I believe quoted in the panel's decision, it wasn't just a condition, not just in the Mississippi Readmission Act, but in the other southern states' Readmission Acts. But it also goes to, and obviously, Judge Jones, I've read your dissent, we are not arguing that Mississippi is not admitted to the Union. We are arguing that when it passed this, it understood that to put these crimes in the category of permanent disenfranchisement was simply to label them as punishment. Let me ask you about that, though, a little further, because when Justice Rehnquist goes through his very thorough, I assume, exposition about the evolution of these sections of the 14th Amendment, he deals with the statute that came one year before Arkansas, I believe, was readmitted under the Readmission Act, Arkansas Act being the model for all the later ones. That was the Reconstruction Act of 1867, and it just referred to disenfranchisement of felons. It didn't use the talismanic word punishment. Now, doesn't that lend support for the idea that one year later, they, and of course, with all the historical reference he has about legislative intent, but one year later, Congress wasn't sub salientio importing some nefarious characterization of disenfranchisement that it could only be resurrected like the mummy after 1961? In other words, don't you have to, you yourself talked about the historical background. Don't you have to look at the Readmission Act in terms of the one-year preceding statute? MR. WELLS. Well, Your Honor, I don't think the act that preceded the Readmission Act said it wasn't punishment. I don't think it qualified it. But in any event, the later past act is explicit, except as a punishment for such crimes as are now felonies at common law. JUSTICE GINSBURG. Mr. Youngwood, what exactly do you want us to hold? I'm very confused at this point. Do you want us to hold that because it's allegedly under-inclusive and over-inclusive, that it's somehow facially violative because you can find particular examples that seem to not fit? Or are you asking us to say that permanent disenfranchisement is cruel and unusual, but I thought you weren't asking us that? It's very unclear to me where you specifically draw your line in this facial challenge. Could you please clarify? MR. YOUNGWOOD. We're asking to declare 241 unconstitutional. The reasons are many, and they are in their brief. The crispest and easiest is that a statute passed as punishment that is an outlier, that is about a fundamental right voting, that taken in a way for life, divorced completely from length of sentence, is cruel, it's unusual, it's completely out of step with the overwhelming supermajority of the other states, which is what the Supreme Court looks at. JUSTICE SCALIA. Counsel, if I'm allowed to ask one more question. Are you, you are, I mean, tell me if I'm wrong. MR. YOUNGWOOD. Of course not. JUSTICE SCALIA. Your argument is that the Supreme Court has said in this circumstance we look at empirically the legislative judgment of the country, and your argument is legislatures around the country have now overwhelmingly, since Richardson, especially since 1997, said that a permanent disenfranchisement that is freakish or arbitrary in the crimes it chooses and has Mississippi's history, that, is that your argument? MR. YOUNGWOOD. It is, Your Honor. JUSTICE SCALIA. I want to ask you, I don't understand, with due respect to the sincere feelings of others, what Mississippi's history has to do with this because cert was denied in the equal protection challenge to this provision. MR. YOUNGWOOD. Your Honor, it JUSTICE SCALIA. If we're going to look at the Mississippi law, we have to look at it because it was readopted by the voters in the 1960s and the legislature refusing to reconsider in the 1980s. MR. YOUNGWOOD. Although, Your Honor, the strictures of the Readmission Act would still, I believe, apply, the context would apply, the way this law has been treated would apply, and I'll first pass in the 1890s, as Your Honor says, crimes were added, crimes were taken away, that is all relevant. But what happened at the beginning is relevant, not as a racial challenge, but for an understanding for how the law has been treated, how it acts, and how it affects citizens in Mississippi. MR. CLEMENT. Can I ask a follow-up question to Judge Higginson's question? If I understand sort of the agreement between the two of you, the theory is essentially one of arbitrariness, that some things are subject to self-advertisement, others are not, and it's sort of kind of a crazy quilt. Is that sort of your theory? MR. YOUNGWOOD. Your Honor, I think that helps. I think my base theory, and again, to answer Your Honor's questions, those weren't my cases. They might be more complicated. But the core is, the core is, I don't want anyone to see us backing down on this, that the Mississippi law is unconstitutional because it's permanent after terms of sentence are completed. MR. CLEMENT. Okay. But, I mean, Section 2 allows for permanence. So to me, let's just focus on this sort of notion of the randomness of the crimes. It just doesn't make sense. You can kind of reoccule which crimes are subject and which crimes are not. Couldn't you say the same thing about federal criminal law? I mean, our crime of violence, categorical rule, that whole body of law can result, does result, in a lot of crazy situations where some crimes are punished very harshly, some crimes not harshly at all, and yet the facts would suggest the opposite. I'm just wondering if the consequences of your cruel and unusual punishment theory are really quite dramatic. I think we'd have to strike down a lot more than just this one law. MR. YOUNGWOOD. Yeah. I, again, Your Honor, I'm not going to argue the next case or the case after that. MR. CLEMENT. But you understand, you appreciate what's going on. MR. YOUNGWOOD. I think this is actually, in some ways, quite a narrow challenge in terms  of crimes, one which is clearly worse than the other, and yet the punishment is off. I'm just wondering how that applies to actual, you know, prison sentences. I'm just, well, I'll leave it at that. MR. CLEMENT. Thank you, Your Honors. Thank you, Your Honor. I'd like to do my best to make three points. First, the colloquy with Judge Duncan, I think, illustrates something very clear. Mr. Youngwood conceded, as I understand it, that a state could permanently disenfranchise in some circumstances. He mentioned, I think, rape, murder, voter crime as examples. With that concession, that dooms his Eighth Amendment case. This is a facial Eighth Amendment challenge. MS. MCDOWELL. Don't you concede that the case, that Richardson was remanded on an as-applied basis? MR. YOUNGWOOD. And for— MS. MCDOWELL. Isn't that your concession in your opening argument as well? MR. YOUNGWOOD. As administered in practice, you know, ways it's administered arbitrarily, Your Honor. That's quite a bit different than does the Eighth Amendment bar all permanent felon disenfranchisement. And again, the concession, again, it was—the plaintiffs chose to bring this as a facial claim, as an as-applied claim. They wanted to go big. They wanted to completely knock out permanent disenfranchisement in Mississippi. That makes their burden incredibly difficult, especially when they have to show that this is a punishment by the clearest proof. They can't show that—Judge Jones, you were exactly right when you said, hey, you have to look at 1968, the version of the law that's in effect now on its face. It is not penal. Number two, I mentioned earlier on this, and it came up from my friend, Mr. Youngwood, a few times. He mentioned voting is critical, it's very important, and he suggested that that is sort of a distinguishing or limiting principle in these punishment cases. That is not a distinguishing or limiting principle. Recognize—Richardson itself recognized that voting was important. Voting was already subject—was already a strict scrutiny, fundamental right proposition at the time that the Supreme Court decided Richardson, and the Supreme Court said, no, we will not apply strict scrutiny here. I would also say, again, in these cases, in these cases about whether something is a constitutional punishment, I mean, these things are always involving important things. I mean, again, liberty. That's Salerno and Hendricks. Occupational debar— Is your argument that it was never meant to be punishment or that we can conclude now that it's not punishment post-1968? I'd say that on this record here, the operative provision is not punishment. I know of no evidence that would make the 1890 version punishment either, Your Honor. I mean, again, neither of them are on their face punishment, and that's what you look at at step one of the Smith v. Doe intent effects regime. Other than the placement of the provision that refers to this list of crimes, what evidence is there that it wasn't meant to be punishment? That it describes qualifications for voters, that it's not labeled punishment, that it sets down things that are traditionally qualifications like registration, residency, age. I mean, those are not thought to be punitive things. Those are just regulations of the franchise that are civil, regulatory, and non-punitive. So those features, Your Honor, I mean— But that's based on what it's close to. I'm sorry? That's based on the placement of the language. Is that what we're talking about? I mean, the text and structure of the statute, or of the constitutional provision, Judge tells us to look at is text and structure is what we look at, the face of the provision at issue. And the face of the provision, you can also look at the implementing statutes where, you know, placement, all of those things show, you know, as I think it was in Hendricks Supreme Court said, nothing on the face of Section 241, adapting that here, shows a punitive intent. And especially when the plaintiffs have this significant burden, they just can't overcome it with clearest proof. Again, as I said before, in thinking about whether something's penal or not, you're going to face, you know, liberty, occupational debarment, being free from double jeopardy, hugely, hugely important in these cases that involve, you know, is something a punishment or not? And the Supreme Court has held that even those things, no matter how severe they are, no matter how harshly they could affect people's lives, the Supreme Court has held things like that not to be punishment and then not—and therefore not subject to things like the Eighth Amendment, the Due Process Clause, the Cruel and Unusual Punishments Clause, those kinds of things. Last, I'd just say on the kind of the Eighth Amendment analysis, this categorical question that we've been discussing, you know, I think a number of the members of the en banc panel have said today, look, adopting the plaintiff's position would create a real line-drawing problem. There's no limiting principle. The court would have to do lots of striking down. I mean, again, how do you knock jurors off of a jury for being, you know, under, you know, an indictment or something like that? I mean, that could be an invalidation of federal law right there if this court adopts the plaintiff's position. But again, I mean, it's something to say death is different. It's something to say juveniles are different. It's an entirely different thing to say that felons are different, somehow different in kind and should be treated differently. With that, we ask the court to reject the plaintiff's Eighth Amendment claim and on the other claims, we're content with how the panel ruled. Thank you, Your Honor. The court will take a brief recess.